IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

SCOTTY HARDIN,                          )
                                        )
                Plaintiff,              )
                                        )
        v.                              )       Case No.
                                        )       14-3504-CV-S-REL-SSA
CAROLYN W. COLVIN, Acting               )
Commissioner of Social Security,        )
                                        )
                Defendant.              )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Scotty Hardin seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Titles II and XVI of the

Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in discrediting the opinion of

plaintiff's treating orthopedic doctor, Terry Green, M.D.; in failing to consider plaintiff's lack

of funds when discrediting him due to lack of treatment; and in discrediting plaintiff's alleged

pain. I find that the substantial evidence in the record supports the ALJ's finding. Therefore,

plaintiff's motion for summary judgment will be denied and the decision of the Commissioner

will be affirmed.

## I.    BACKGROUND

On June 1, 2012, plaintiff applied for disability benefits alleging that he had been

disabled since March 15, 2012. Plaintiff's disability stems from thoracic spondylosis, chronic

neck and back pain, limited mobility in his neck and upper arms, weakness in his upper and

lower extremities, difficulty sitting and standing, inability to lift overhead, anxiety, depression,

short term memory loss, poor concentration, fluid around C-6 and fractured T-4. Plaintiff's

application was denied on August 9, 2012. On July 8, 2013, a hearing was held before an

Administrative Law Judge. On September 19, 2013, the ALJ found that plaintiff was not under

a "disability" as defined in the Act. After receiving medical records from Jose Atiles, M.D.,

dated June 4, 2014, to April 26, 2013, and medical records from Ozarks Medical Center Behavioral Health Clinic,[1] the Appeals Council on October 1, 2014, denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).

---

[1]The administrative transcript contains a letter from plaintiff's counsel to the Appeals Council dated April 13, 2014 (Tr. at 6).  The letter states that medical records from Ozarks Medical Center Behavioral Health Clinic dated "07/29/14-06/04/14 [sic]" were being submitted and plaintiff requested that these additional records be considered by the Appeals Council.  Clearly these dates are incorrect as they had not occurred yet at the time the letter was written.  The Appeals Council did state that records from Ozarks Medical Center Behavioral Health Clinic dated "October 7, 2013 to July 29, 2014" were considered (Tr. at 2).

However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

>       Yes = disabled.
>       No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

>       No = not disabled.
>       Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

>       Yes = disabled.
>       No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff, his two sisters, and vocational expert Janice Hastert, in addition to documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income, shown in both actual and indexed figures:

| Year | Actual Earnings | Indexed Earnings |
|------|----------------|------------------|
| 1990 | $ 4,816.83 | $ 9,546.13 |
| 1991 | 4,396.63 | 8,400.32 |
| 1992 | 105.00 | 190.79 |
| 1993 | 4,992.40 | 8,993.88 |
| 1994 | 0.00 | 0.00 |
| 1995 | 2,450.91 | 4,134.23 |
| 1996 | 8,269.40 | 13,298.56 |
| 1997 | 8,677.75 | 13,185.85 |
| 1998 | 267.15 | 385.75 |

4

| | | |
|------|------------|------------|
| 1999 | 9,506.53 | 13,002.15 |
| 2000 | 12,682.64 | 16,437.17 |
| 2001 | 13,708.40 | 17,352.62 |
| 2002 | 14,306.77 | 17,930.24 |
| 2003 | 14,538.98 | 17,786.46 |
| 2004 | 15,469.70 | 18,084.37 |
| 2005 | 15,752.14 | 17,764.54 |
| 2006 | 16,486.14 | 17,775.30 |
| 2007 | 16,679.55 | 17,203.13 |
| 2008 | 17,395.97 | 17,538.58 |
| 2009 | 17,758.04 | 18,177.75 |
| 2010 | 18,550.01 | 18,550.01 |
| 2011 | 18,225.00 | 18,225.00 |
| 2012 | 7,990.76 | 7,990.76 |
| 2013 | 0.00 | 0.00 |

(Tr. at 182-184, 191).

### Disability Report - Field Office

On June 14, 2012, A. Wright from Disability Determinations met face to face with plaintiff and observed that he walked with a limp and seemed uncomfortable sitting in the chair (Tr. at 201). Plaintiff "had a hard time keeping eye contact with me. He looked down most of the time and seemed to be depressed. He teared up several times and expressed to me how horrible it has been for him not being able to work."

### Bakersfield R-IV School Records

Records from Bakersfield R-IV School District show that plaintiff was placed in Special Education in 1983 (Tr. at 387-394). Plaintiff's full scale IQ was measured at 78 in November 1982, and in 11th grade he had a "mental age" of 10 years, 4 months (Tr. at 388-389). The records include the following, which appears to be a summary of a meeting of the Board of

5

Education: "On February 10, 1987, the Board of Education of Bakersfield R-IV agreed to the request of Mr. & Mrs. Joe Hardin and their son Scott, that Scott be allowed to attend only Vo-Tech in West Plains in the morning and then return home to work at his father's sawmill or in the shop. Scott will be able to graduate in May under this arrangement. This matter was discussed with the IEP Center and approved by Scott's LD teacher and Director of Special Education as well, since Scott has completed his special education requirements." (Tr. at 391). Plaintiff graduated on May 22, 1987 (Tr. at 394).

**B.      *SUMMARY OF MEDICAL RECORDS***

At approximately 10:00 p.m. on March 15, 2012, plaintiff was seen at Ozarks Medical Center by Lee Gibson, D.O. (Tr. at 328-351). Plaintiff had been in an automobile accident and arrived by ambulance (Tr. at 328). Plaintiff had lost consciousness for about five minutes after the accident according to bystanders (Tr. at 328, 339). He said he had been a passenger in the vehicle when the driver lost control, causing the vehicle to roll over, and plaintiff who was unrestrained was thrown from the vehicle (Tr. at 328). Plaintiff was the only person at the scene, however, and was intoxicated (Tr. at 328, 343). Swelling of plaintiff's head was observed along with abrasions to his scalp (Tr. at 329). He had painful range of motion in his neck which had been immobilized (Tr. at 329). He had tenderness and abnormal range of motion in his back, which had also been immobilized (Tr. at 329). CT scans of the face, head and cervical spine were normal (Tr. at 329). CT scan of the thoracic spine showed a fracture of T4[2] (Tr. at 330, 344, 349). He was assessed with back pain and thoracic spine fracture (Tr.

---

[2]"Nondisplaced T4 vertebral fracture involving the anterior half of the body. . . . There is no subluxation [slight misalignment of the vertebrae] or loss of vertebral height. The pedicles are intact and there is no evidence of spinal canal compromise." (Tr. at 349).



6

at 334, 335).  Plaintiff was given IV pain medication during his hospital stay and rated his pain a 3/10 upon discharge the following afternoon (Tr. at 342).  He was discharged with a prescription for Lortab (narcotic) (Tr. at 344).  His discharge assessment included tachycardia/hypertension:  "I suspect this relates to the patient's discomfort and anxiety level. I am hesitant to initiate anti-hypertensive medications in this setting.  However, Mr. Hardin will require follow-up with a primary care physician."  Plaintiff was also assessed with morbid obesity and hyperglycemia:  "The patient is very likely diabetic or prediabetic."  He was started on oral diabetes medication.

On March 26, 2012, plaintiff saw Terry Green, M.D., an orthopedic specialist, for complaints of cervical sprain with pain radiating into the left arm (Tr. at 364-368).  Plaintiff described severe back pain (7 out of 10 in intensity) on both sides and his neck (Tr. at 364, 367).  He said the pain was constant but fluctuated in intensity and was worsening (Tr. at 364).  Movement exacerbated his pain (Tr. at 364).  Plaintiff was taking Percocet (narcotic). His pulse was 104; blood pressure was 132/100 (Tr. at 365).  Plaintiff weighed 263 pounds and was 5' 7" tall resulting in a body mass index of 41.19 (Tr. at 365).  Plaintiff was able to ambulate normally (Tr. at 365).  He had 4/5 strength in his left arm (Tr. at 365).  Plaintiff was noted to be cooperative with appropriate mood and affect (Tr. at 365).  X-rays were normal (Tr. at 366).  Dr. Green assessed cervical sprain and radicular pain in the left arm (Tr. at 366). He ordered a CT scan, told plaintiff to wear a cervical collar, prescribed Norco (narcotic), and excused plaintiff from working for the next two weeks (Tr. at 366).

On April 9, 2012, plaintiff saw Dr. Green for a follow up (Tr. at 369-371).  Plaintiff reported continued pain in his neck and the middle of his shoulder blades.  He rated his pain a 5 out of 10 in severity.  The pain was constant but fluctuated in intensity.  Pain was exacerbated by movement.  Plaintiff also reported numbness in his left thumb.  Plaintiff's pulse

7

was 111 and his blood pressure was 132/86. He weighed 258 pounds. Plaintiff was noted to be cooperative with appropriate mood and affect. CT scan and x-rays were normal. Plaintiff was released to return to work on April 16, 2012. He was told to return for a follow-up visit if his symptoms worsened or recovery was not "as expected."

On May 30, 2012, plaintiff saw Thomas Briggs, M.D., in the Springfield Neurological & Spine Institute after having been referred by Dr. Green (Tr. at 358-362). Plaintiff was listed as "self pay." Plaintiff's chief complaint was neck pain and intermittent numbness of the left arm. Plaintiff was taking narcotic pain medication and reported pain since his motor vehicle accident in March. Plaintiff reported walking for exercise five to six times per week. He reported difficulty with concentration, memory loss, anxiety and depression. Dr. Briggs noted limited range of motion due to muscle tenderness posteriorly. "He has extensive post traumatic pain at the suboccipital area and upper thoracic area." Plaintiff's range of motion in his neck



and back were normal (Tr. at 360). Plaintiff had normal range of motion in his arms with normal muscle tone and strength and normal stability (Tr. at 360). He had normal range of motion, muscle strength, tone and stability in his legs with negative straight leg raising (Tr. at 360). Dr. Briggs reviewed plaintiff's cervical spine CT from March 2012 which showed no abnormalities or instability (Tr. at 361). He assessed persistent neck pain and severe obesity. (Tr. at 361). "No surgical treatment indicated. Weight loss advised. Management of nonsurgical pain recommended through his family physician. . . . We had a lengthy discussion today about cervical spine disease and treatment options. We discussed that not all cervical spine disease can be improved upon with surgical treatment and that the importance of range of motion exercises, regular physical therapy and judicial use of pain medication is sometimes most appropriate." (Tr. at 361). Dr. Briggs discussed a healthy

lifestyle and recommended a low fat, low cholesterol diet and regular exercise (Tr. at 362).

On May 31, 2012, plaintiff saw Dr. Green for a follow up (Tr. at 372-375, 422-424). Plaintiff reported continued back pain. Plaintiff's pulse rate was 103; his blood pressure was 150/98. He weighed 253 pounds. He was observed to be in mild distress, but he was able to ambulate normally. On exam he had moderate tenderness and pain in his thoracic spine. He was cooperative with an appropriate mood and affect. X-rays of plaintiff's thoracic spine were taken. He was assessed with back pain and thoracic spondylosis,[3] worsening. "Released from work until further notice. I believe he would be a good candidate for disability due to his back problems." Dr. Green prescribed Norco (narcotic).

On June 4, 2012, plaintiff was seen at Behavioral Healthcare complaining of "anxiety and depression - lost job over 'this whole deal'" (Tr. at 491-492). Plaintiff weighed 259 pounds. His gait was normal but he had tenderness and decreased range of motion in his back. "Affect pleasant but stated he is depressed and anxious." Plaintiff was assessed with alcohol abuse and dependence, major depressive disorder, generalized anxiety disorder, and chronic back pain. Referral for psychiatric services was done. Plaintiff was prescribed Celexa (antidepressant) and Buspar (anti-anxiety), however these medications were not listed on any of his future medical records so it is unclear whether he ever took them.

On August 13, 2012, plaintiff was seen at the Gainesville Medical Clinic to establish care (Tr. at 452-453) . He complained of constant back pain which he rated a 7 out of 10 in intensity. He reported difficulty bending over and "standing for long periods." Plaintiff weighed 264 pounds. His pulse was 120, his blood pressure was 130/90. X-rays of the lumbar and thoracic spine showed "good alignment." He was assessed with chronic lower

---

[3]"Spondylosis" is a blanket term used by physicians to describe general deterioration in the spine. Thoracic spondylosis is degeneration of the soft tissue in the thoracic section, or mid-section, of the spine.

9

back pain. "Charity paperwork given to the patient. He needs phys. tx. Consider MRI."

On October 5, 2012, plaintiff was seen by Jose Atiles, M.D., at Doctors Urgent Care (Tr. at 426-428, 488-490). Plaintiff complained of pain in his upper thoracic spine without radiation. "He characterizes it as intermittent, mild in severity, moderate in intensity, and sharp. This is a chronic, but intermittent problem, with an acute exacerbation. He states that the current episode of pain started 7 to 8 months ago. The event which precipitated this pain was a motor-vehicle accident (lost control of the vehicle; he was the driver; was not wearing a seatbelt)." In a review of symptoms, plaintiff denied anxiety and depression. He reported that his pain had a detrimental impact on his concentration, mood, repetitive motion activities, and walking. He rated his pain a 5 out of 10 in severity. Plaintiff was taking Flexeril (muscle relaxer) three times a day and Naprosyn (non-steroidal anti-inflammatory) twice a day. He weighed 266.5 pounds with a body mass index of 42.4. His pulse was 101 and his blood pressure was 145/91. Dr. Atiles assessed upper back pain, refilled plaintiff's Flexeril and Naprosyn, and ordered an MRI.

On October 10, 2012, plaintiff was seen at the Gainesville Medical Clinic complaining of back pain (Tr. at 450-451). He rated his pain a 6 out of 10 in intensity. Plaintiff weighed 273 pounds. His gait was "abnormal" and he had tenderness and decreased range of motion in his back. He was assessed with chronic lower back pain. An MRI was ordered, and the records appear to recommend physical therapy through chronic care.

On November 30, 2012, plaintiff saw Dr. Atiles at Doctors Urgent Care (Tr. at 429-431, 485-487). Plaintiff complained of upper back pain. Plaintiff described his pain as intermittent, mild in severity, moderate in intensity, and sharp. Plaintiff denied anxiety and depression. Plaintiff weighed 275 pounds. His pulse was 121, his blood pressure was 137/86. Dr. Atiles noted that plaintiff was morbidly obese. He had full range of motion in his neck and

10



a normal gait. Decreased range of motion was noted in **back flexion and extension and lateral flexion**. He had pain with range of motion as well and tenderness in his thoracic spine. Dr. Atiles assessed upper back pain and refilled plaintiff's Flexeril and Naprosyn. He prescribed Hydrocodone/Acetaminophen (narcotic).

On December 10, 2012, Dr. Green completed a six-page Physical Medical Assessment Questionnaire (Tr. at 395-399). His diagnoses were thoracic spondylosis and bone spurs.[4] Plaintiff's symptoms were pain in the upper back, neck, shoulders and arms. Although the form asked Dr. Green to identify the clinical findings and objective signs, that question was left blank. The form asked Dr. Green to describe the treatment response including any side effects of medication; that too was left blank. Dr. Green stated that "emotional factors" contributed to the severity of plaintiff's symptoms and functional limitations and marked depression, anxiety and physical condition as psychological conditions affecting plaintiff. Dr. Green found that plaintiff's pain was severe enough to interfere with his attention and concentration constantly and that plaintiff was "incapable of even 'low stress' jobs." He found that plaintiff cannot walk at all without severe pain, that he could sit at one time for zero minutes before needing to get up, and that he could stand for 10 minutes at a time. He found that plaintiff could sit for less than 2 hours per day and that he could stand or walk for less than 2 hours per day. He found

---

[4]"Bone spurs are bony projections that develop along the edges of bones. Bone spurs (osteophytes) often form where bones meet each other -- in your joints. They can also form on the bones of your spine. The main cause of bone spurs is the joint damage associated with osteoarthritis. Most bone spurs cause no symptoms and may go undetected for years. They may not require treatment."
http://www.mayoclinic.org/diseases-conditions/bone-spurs/basics/definition/con-20024478

that plaintiff needed to walk around for 5 minutes every 30 minutes during the day. He found that plaintiff would sometimes need to take unscheduled breaks every 20 to 30 minutes during the day. He found that plaintiff could occasionally (defined at 6% to 33% of the day) lift and carry less than 10 pounds. He could occasionally look down, look up, and hold his head in a static position. He could rarely twist, stoop or turn his head right or left. He could never crouch, squat, or climb ladders or stairs. He estimated plaintiff is likely to miss more than 4 days of work per month due to impairments or treatment. When asked to identify any signs or symptoms plaintiff exhibited that affected his wrists, hands or fingers, Dr. Green marked tenderness, pain, muscle spasm, muscle weakness, limitation of motion, and reduced grip strength. He did not complete the portion of the form regarding limitations with reaching, handling or fingering.

On December 28, 2012, plaintiff saw Dr. Atiles at Doctors Urgent Care (Tr. at 432-434, 482-484). Plaintiff continued to complain of pain in his upper thoracic region which he described as intermittent, mild in severity, moderate in intensity and sharp. Plaintiff denied anxiety and depression. He weighed 274 pounds, his pulse was 84, and his blood pressure was 137/86. He was noted to be morbidly obese. His gait was normal. He had decreased range of motion in black flexion, extension and lateral flexion and pain with range of motion. Tenderness was noted in his mid back. He was assessed with upper back pain. His narcotic pain medication was refilled and an MRI was ordered. Dr. Atiles recommended that plaintiff lose 40 pounds.

On January 2, 2013, plaintiff had an MRI of his thoracic spine (Tr. at 402, 435). He was covered by Medicaid. The findings were benign hemangiomas[5] within C6 and T4, and

---

[5]Bone hemangiomas are benign, malformed vascular lesions. They are usually asymptomatic and discovered incidentally on imaging.

12

small focal central disc herniations[6] at T4-T5 and T56-T6 causing mild effacement of ventral CSF,[7] no significant impingement or stenosis.[8]

On January 11, 2013, plaintiff saw Dr. Atiles at Doctors Urgent Care for continued back pain (Tr. at 436-438, 479-481). Plaintiff denied anxiety and depression. He weighed 280 pounds. His pulse was 102, his blood pressure was 139/82. He was noted to be morbidly obese. He had normal gait but decreased range of motion in back flexion and extension and lateral flexion. He had pain with range of motion. MRI results were reviewed. Dr. Atiles assessed upper back pain. He refilled plaintiff's Skelaxin (muscle relaxer) and referred him to a chronic pain specialist and a neurosurgeon.

On January 18, 2013, plaintiff was seen by Dr. Atiles for continued back pain (Tr. at 440-442, 476-478). Plaintiff denied anxiety and depression. He weighed 276 pounds, his blood pressure was 136/90. He was noted to be morbidly obese. He had decreased range of motion in his back along with tenderness. Dr. Atiles refilled plaintiff's Gabapentin (treats nerve pain, also called Neurontin), narcotic pain medication and Naprosyn.

On January 31, 2013, plaintiff saw Celeste Williams, a nurse practitioner at Doctors Urgent Care, complaining of a toothache (Tr. at 444-445, 474-475). He denied anxiety and

---

[6]"A herniated disk refers to a problem with one of the rubbery cushions (disks) between the individual bones (vertebrae) that stack up to make your spine. A spinal disk is a little like a jelly donut, with a softer center encased within a tougher exterior. Sometimes called a slipped disk or a ruptured disk, a herniated disk occurs when some of the softer 'jelly' pushes out through a crack in the tougher exterior. A herniated disk can irritate nearby nerves and result in pain, numbness or weakness in an arm or leg. On the other hand, many people experience no symptoms from a herniated disk." http://www.mayoclinic.org/diseases-conditions/herniated-disk/basics/definition/con-20029957

[7]Mild compression of the cerebrospinal fluid located around the spinal cord.

[8]Pinching of the spinal cord, or narrowing of the open spaces within the spine with can put pressure on the spinal cord and nerves that travel through the spine to the arms and legs.

13

depression. Plaintiff weighed 278 pounds. His pulse was 106, his blood pressure was 159/89.

On February 14, 2013, plaintiff saw Ricardo Kennedy, M.D., at Pain Treatment Associates, after having been referred by Dr. Atiles (Tr. at 403, 456-460). Plaintiff was covered by Medicaid. Plaintiff complained of intermittent, sharp, burning pain aggravated with head movement and bending forward to pick up something. His pain was somewhat alleviated with stretching his arms upward or lying flat on his back. He complained of numbness and tingling in his right fingers along with weakness in his grip. Plaintiff reported difficulty performing activities of daily living due to pain, and he reported difficulty sitting for prolonged periods and lifting. Plaintiff reported depression and a "high stress level." He rated his pain a 6 to 9 on a scale of 1 to 10 on average. He weighed 273 pounds with a body mass index of 42.75. His pulse was 96, blood pressure was 142/103. He was noted to be morbidly obese. On exam plaintiff had pain and limitation of cervical spine range of motion, primarily rotation. His gait was coordinated and smooth. Motor strength was normal. Dr. Kennedy ordered an MRI.

On March 12, 2013, plaintiff had an MRI of his cervical spine which showed disc bulges[9] at C5-6 and C6-7 causing flattening of the thecal sac[10] without cord compression or stenosis and a vertebral body hemangioma (see footnote 5 on page 12) at C6 with no acute

---

[9]"Disks act as cushions between the vertebrae in your spine. They're composed of an outer layer of tough cartilage that surrounds softer cartilage in the center. It may help to think of them as miniature jelly doughnuts, exactly the right size to fit between your vertebrae. A bulging disk extends outside the space it should normally occupy. The bulge typically affects a large portion of the disk, so it may look a little like a hamburger that's too big for its bun. The part of the disk that's bulging is typically the tough outer layer of cartilage. Bulging usually is considered part of the normal aging process of the disk." http://www.mayoclinic.org/diseases-conditions/herniated-disk/expert-answers/bulging-disk/faq-20058428

[10] This is the name given for the elongated membraneous tube that extends from the brain to the end of the spine in which the spinal cord and nerve roots run.

Case 6:14-cv-03504-REL   Document 13   Filed 01/04/16   Page 14 of 33



osseous (bone) abnormality and no cord edema (swelling) or myelomalacia (softening of the spinal cord) (Tr. at 404-405, 461). "No evidence of flexion or extension instability through the C6 level."

On March 13, 2013, plaintiff saw Alice Mills, a nurse practitioner at Pain Treatment Associates, with complaints of neck pain (Tr. at 406, 462-464). The results of plaintiff's MRI were reviewed. Plaintiff weighed 281 pounds with a body mass index of 44. His pulse was 101. His gait was broad-based. He was told to continue taking Naproxen (non-steroidal anti-inflammatory, also called Naprosyn), Norco (narcotic)and Zanaflex (muscle relaxer) and to stop the Gabapentin.

On April 23, 2013, plaintiff saw Dr. Atiles for a sinus infection (Tr. at 446-448, 471-473). Plaintiff denied anxiety and depression but reported pain that was affecting his concentration, mood, repetitive motion activities, and walking. Plaintiff weighed 283 pounds with a body mass index of 45. He was morbidly obese. His blood pressure was 143/97. He had a normal gait but decreased range of motion in his back.

On May 8, 2013, plaintiff saw Alice Mills, a nurse practitioner at Pain Treatment Associates (Tr. at 465-467). He weighed 281 pounds, his pulse was 101, his blood pressure was 144/93. His pain continued to average 5 out of 10 despite treatment. Meloxicam (non-steroidal anti-inflammatory) was substituted for Naproxen, and plaintiff's Norco was increased, per Dr. Kennedy.

On June 5, 2013, plaintiff saw Alice Mills, a nurse practitioner at Pain Treatment Associates (Tr. at 455, 468-470). Plaintiff reported good benefit from Norco, Zanaflex, and Meloxicam. He reported his pain an average of 3 out of 10. He weighed 282 pounds, his pulse was 98, and his blood pressure was 149/90. He was noted to be morbidly obese. He was continued on his same medications.

15

On June 7, 2013, John Axline, M.D., a medical expert, reviewed plaintiff's medical records and completed interrogatories at the request of the Administrative Law Judge (Tr. at 409-413). Dr. Axline found that plaintiff had degenerative disc disease in the cervical spine without loss of neurologic function as shown on an MRI, and degenerative disc disease of the thoracic spine without loss of neurologic function as shown on an MRI. Dr. Axline wrote, "The 'fracture' of T4 was an incorrect diagnosis wherein an asymptomatic and pre-existing hemangioma of the T4 vertebral body was felt to be an acute fracture. No fracture was present." (Tr. at 412).

That same day Dr. Axline completed a Medical Source Statement Physical (Tr. at 414-419). He found that plaintiff could frequently lift and carry up to 10 pounds, occasionally lift and carry up to 20 pounds, sit for 2 hours at a time and up to 6 hours per workday, stand for 2 hours at a time and up to 6 hours per workday, and walk for 2 hours at a time and up to 6 hours per workday. He found that plaintiff could occasionally reach overhead with both arms; frequently reach in all other directions; continuously handle, finger, or feel; and frequently push or pull with his hands or feet. He found that plaintiff could frequently climb ramps and stairs, stoop, kneel, crouch, or crawl; occasionally climb ladders or scaffolds; and continuously balance. He found that plaintiff could have continuous exposure to unprotected heights and moving mechanical parts; frequently be exposed to humidity, wetness, extreme temperatures and vibrations; and occasionally operate a motor vehicle or be exposed to dust, odors, fumes or pulmonary irritants.

On October 7, 2013, plaintiff was seen at Behavioral Healthcare (Tr. at 20-21). He weighed 290 pounds. His pulse was 109. His gait was normal but he had tenderness and decreased range of motion in his mid back. Recent memory was good. He reported being depressed and was having trouble sleeping. He was prescribed Celexa (antidepressant) and

16

Trazodone (antidepressant and sedative).

On October 23, 2013, plaintiff was seen at Behavioral Healthcare (Tr. at 18-19). He weighed 294 pounds. Plaintiff reported severe back pain. He reported good memory and continued depression "but brighter for last week." He was assessed with chronic back pain and obstructive sleep apnea (although there is no evidence plaintiff had undergone a sleep study). He was told to keep his appointment with the pain management clinic. His Celexa was increased. "Pt chooses not to see therapist or psych at this time."

On January 29, 2014, plaintiff had a follow up with Behavioral Healthcare (Tr. at 16-17). He continued to have back pain but he said that his anxiety, depression and insomnia were controlled with medication. He denied memory problems. Plaintiff weighed 292 pounds. His mood and affect were pleasant and quiet. Plaintiff's Celexa and Trazodone were refilled.

On March 10, 2014, plaintiff had a follow up with Behavioral Healthcare (Tr. at 14-15). Plaintiff reported constant back pain which he rated a 6 out of 10 in severity, increased depression, and increased fatigue. He weighed 292 pounds. He was "referred to psych for eval[uation]."

On April 28, 2014, plaintiff had a follow up with Behavioral Healthcare (Tr. at 12-13). He continued to rate his back pain a 6 out of 10 in severity. His anxiety and depression were noted to be stable. He weighed 294.8 pounds. He was assessed with major depressive disorder, chronic back pain and obesity. His Celexa and Trazodone were refilled.

On July 29, 2014, plaintiff saw Lu Yang, a social worker at Ozarks Medical Center, for a clinical assessment (Tr. at 7-11). His chief complaint was "stress of unemployment and taking care of elderly parents." Plaintiff continued to use narcotic pain medication, a non-steroidal anti-inflammatory, and a muscle relaxer.

He reports being stressed over taking care of elderly parents, stating "my dad got stage 4 lung cancer, dealing with that on a daily basis." He has been taking care of his

parents for the last five years. He has "two sisters that help some". But he is the main care giver. He is also stressed due to unemployment and financial issues. He stating "being stressed about not being able to work since 3/20/12, had to quit a job I've worked for 13 years due to back problem".

Plaintiff reported the following symptoms: not getting much sleep, not being able to think straight due to constant anxiety, forgetting simple things and needing to write things down to remember, being worried over simple things, being stressed over what he is going to do next, loss of interest in hobbies, lack of energy, not eating a healthy diet, and having to deal with the stress of Social Security disability because he lost his job. Obstacles to treatment included limited income, poor support system. Plaintiff's previous psychiatric/substance abuse treatment occurred in 2010 which was court ordered due to a DWI conviction. He reported this treatment as helpful because, "I don't drink anymore."

Plaintiff was assessed with adjustment disorder with mixed depressed mood and anxiety. His GAF was 52.[11] The record includes the following:

> This diagnosis is based on information provided by patient during initial examination. Diagnosis may change as additional information becomes available through course of treatment. Above diagnosis Should Not be used for any purposes other than as a working diagnosis for medical care of the patient, including determination of whether the patient's condition is sufficiently acute to impair the patient's ability to work or perform other routine tasks.

C.    SUMMARY OF TESTIMONY

During the July 18, 2013, hearing, the following individuals testified: plaintiff; Karen Hardin; Myra Sasseen; and vocational expert Janice Hastert.

1.    Plaintiff's testimony.

At the time of the hearing plaintiff was 44 years of age (Tr. at 160). Plaintiff was in special education classes when he was in school because he had trouble concentrating and

---

[11]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

remembering (Tr. at 53). He does not believe he was ever diagnosed with a particular problem (Tr. at 53). Plaintiff is 5' 8" tall and weighs around 275 or 280 pounds (Tr. at 54, 61).

In March 2012 plaintiff was in an automobile accident which knocked him out for about ten minutes (Tr. at 49-50, 55). Since then he has never been pain free (Tr. at 49-50). He was off work for three weeks after the accident (Tr. at 50). He tried to return to work, but he could only work one day and would need to be off work a couple days after that due to his pain (Tr. at 50). Plaintiff was getting in trouble for missing too much work and for being too slow when he was on the job (Tr. at 55). Plaintiff has pain and spasms in his upper back, neck, arm and shoulder every day (Tr. at 48). His pain is a 5 or a 6 out of 10 constantly (Tr. at 50). He also has constant pain in his shoulders and neck which prevents him from lifting overhead (Tr. at 51, 57). He is unable to go back to work until he has surgery to fix his back (Tr. at 48, 51, 62). He was told he would need thousands of dollars to have the surgery (Tr. at 57).

Plaintiff lives with his sister (Tr. at 49). If it were not for her, he would be homeless (Tr. at 49). Plaintiff is covered by Medicaid, which is how he is able to afford his medications (Tr. at 51, 63). Plaintiff's orthopedic surgeon, Dr. Green, does not accept Medicaid (Tr. at 63-64). Dr. Green referred plaintiff to Dr. Thompson, a pain management specialist (Tr. at 63-64). Plaintiff was told he would need to lose weight before he has surgery and he has been trying to but it is not easy (Tr. at 64).

Plaintiff was previously on medication for depression, but he did not have the money to go back to that doctor and "just never did schedule another appointment to get that taken care of," so he is no longer taking depression medication (Tr. at 52). Plaintiff sometimes only gets up to take a cold or hot shower to try to relieve his pain (Tr. at 48). His constant pain keeps him in bed all day (Tr. at 62). He still suffers from depression and does not like to go anywhere due to pain and being around people (Tr. at 52). Plaintiff worries about how to pay

his bills, and his situation is emotionally draining (Tr. at 61-62).

Plaintiff's eyes "jerk" and he has trouble focusing (Tr. at 56). He has had his eyes checked and there is not much that can be done (Tr. at 56). He also has trouble now putting his thoughts into words (Tr. at 56). Plaintiff's medications make him drowsy (Tr. at 56). He has suffered from allergies for many years which have gotten progressively worse (Tr. at 57-58). He takes allergy medication on a daily basis or he cannot breathe (Tr. at 58). Plaintiff experiences numbness in his arms and legs, and he experiences weakness whenever he has spasms (Tr. at 60-61). He has spasms about four times a day from one to five minutes at a time (Tr. at 61).

During a typical night, plaintiff gets about three hours of sleep total -- he is up every 30 minutes or so (Tr. at 54). He has to take several naps during the day and never feels rested (Tr. at 54, 61). Plaintiff cannot sit, stand or walk for more than ten minutes each (Tr. at 59). Plaintiff cannot bend, squat, crawl, climb stairs, twist, climb ladders, work at unprotected heights, or work around temperature extremes, humidity, dust, fumes or gases (Tr. at 59-60).

## 2. Karen Hardin's testimony.

Plaintiff's sister, Karen Hardin, allows plaintiff to live with her (Tr. at 66). Plaintiff spends a lot of time alone in his bedroom watching television (Tr. at 66). He cannot do basic things that he used to do, such as mowing (Tr. at 66). Without family he would be homeless since he does not have friends -- he has become reclusive (Tr. at 66-67). Plaintiff is very depressed (Tr. at 67). He loved the people he worked with and he loved his job even though it was pretty physically demanding (Tr. at 67). Plaintiff has pain in his neck and mid-back, and he complains of numbness in his hands (Tr. at 68). He does not sleep well (Tr. at 68). He never seems to be able to get comfortable, even sitting (Tr. at 68).

Case 6:14-cv-03504-REL   Document 13   Filed 01/04/16   Page 20 of 33

3.      **Myra Sasseen's testimony.**

Plaintiff's sister, Myra Sasseen, has observed that plaintiff has become very depressed and no longer does much of anything (Tr. at 70).  He used to enjoy going to stock car races and was very active (Tr. at 70).

4.      **Vocational expert testimony.**

Vocational expert Janice Hastert testified at the request of the Administrative Law Judge. The first hypothetical involved a person who could lift 10 pounds; stand 2 hours per day; sit 6 hours per day; occasionally climb stairs, stoop, crouch, kneel, crawl, push, pull or reach overhead; and never climb ropes, scaffold or ladders.  The person should avoid prolonged exposure to chemicals, dust, fumes, noxious odors, unprotected heights and hazardous moving machinery.  He is limited to jobs that do not demand attention to details and complicated job tasks (Tr. at 71-72).  Such a person could not perform any of plaintiff's past relevant work (Tr. at 72).  The person could, however, work in unskilled, sedentary jobs such as ampule sealer, D.O.T. 559.687-014, with 600 jobs in Missouri and 27,400 in the country; final assembler, D.O.T. 713-687-018, with 160 jobs in Missouri and 12,000 in the country; or semiconductor bonder, D.O.T. 726-685-066, with 820 jobs in Missouri and 66,500 in the country (Tr. at 72).

The second hypothetical was the same as the first except the person would need to take unscheduled breaks every 20 to 30 minutes, would be unable to maintain acceptable levels of punctuality, and he would miss up to four days of work per month (Tr. at 72-73).  Such a person would be unemployable (Tr. at 73).

The third hypothetical involved a person who could lift less than 10 pounds, walk or stand for 2 hours per day, and sit for 2 hours per day (Tr. at 73).  Such a person could not work (Tr. at 73).

Case 6:14-cv-03504-REL   Document 13   Filed 01/04/16   Page 21 of 33

## V. *FINDINGS OF THE ALJ*

Administrative Law Judge Michael D. Shilling entered his opinion on September 19, 2013 (Tr. at 27-35). Plaintiff's last insured date is December 31, 2016 (Tr. at 29).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 29).

Step two. Plaintiff has the following severe impairments: degenerative disc disease of the cervical spine, degenerative disc disease of the thoracic spine, obesity, and severe allergies (Tr. at 29). Defendant's alleged depression and low intellectual functioning are non-medically determinable impairments (Tr. at 29). Plaintiff has not been diagnosed with these impairments and is not receiving any treatment (Tr. at 29). Significant weight was given to the opinions of the state agency psychological consultants on this issue (Tr. at 29-30).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 30).

Step four. Plaintiff retains the residual functional capacity to perform sedentary work in that he can lift and carry 10 pounds frequently; sit for 6 hours; stand and walk for 2 hours; occasionally climb stairs, stoop, kneel, crouch, or crawl; never climb ropes, scaffolds, or ladders; occasionally push or pull; occasionally reach overhead or handle overhead; frequently reach and handle otherwise; must avoid prolonged exposure to chemicals, dusts, fumes and noxious odors; must avoid unprotected heights and hazardous moving machinery; and is limited to jobs that do not demand attention to details or complicated jobs tasks/instructions (due to reports of chronic pain and potential side effects of medication) (Tr. at 30). In reaching this conclusion, the ALJ found plaintiff's testimony only partially credible; he gave only minimal weight to the opinion of treating orthopedic surgeon Terry Green, M.D.; and he gave significant weight to the opinion of John Axline, M.D., a medical expert (Tr. at 32-33).

22

With this residual functional capacity, plaintiff is unable to perform his past relevant work as a lure assembler, forklift operator, or hospital housekeeper (Tr. at 33).

Step five. Plaintiff is capable of performing other work such as ampule sealer, final assembler, and semi-conductor bonder (Tr. at 34).

## VI.     OPINION OF TERRY GREEN, M.D.

Plaintiff argues that the ALJ erred in discounting the opinion of Terry Green, M.D. The specific findings of Dr. Green on which plaintiff focuses his argument are that plaintiff's pain was severe enough to interfere with his attention and concentration to perform even simple tasks, and that plaintiff was incapable of performing even low stress jobs. Dr. Green is an orthopedic specialist.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability, particularly by medical signs and laboratory findings; consistency with the record as a whole; and other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with the other information in the case record. 20 C.F.R. §§ 404.1527, 416.927.

The ALJ had this to say about the opinion of Dr. Green:

Terry Green, M.D., submitted a medical source statement dated December 10, 2012. Dr. Green opined that the claimant could perform less than sedentary exertional level

23

work in that he could lift and carry less than 10 pounds occasionally and he could sit, stand, and walk for a total of 4 hours a day. He also opined that he could not concentrate to work full time because of anxiety and depression. The undersigned has considered these opinions but affords them minimal weight for the following reasons. They are inconsistent with the imaging contained within the record that shows the claimant has only moderate degeneration in his thoracic and cervical spine. They are also inconsistent with the fact that the claimant has only undergone a moderate amount of treatment for his impairments. If he was as limited as Dr. Green is opining it seems he would have sought a greater level of treatment. Additionally, his treatment notes do not document any significant limitations in the claimant's functioning. The only physical abnormality noted in his last treatment note was that the claimant exhibited some moderate pain in his thoracic spine. Additionally, his opinions that the claimant had mental limitations are not supported by the record. He has not treated the claimant for any mental impairment and has not documented any mental limitations in his treatment notes.

(Tr. at 33).

I have reviewed the ALJ's finding in light of the evidence outlined above and the factors listed in 20 C.F.R. §§ 404.1527 and 416.927. Dr. Green treated plaintiff for two months. He saw plaintiff a total of three times. Although Dr. Green is an orthopedic specialist, it is his opinion on plaintiff's ability to pay attention, concentrate, and work under stress that is the focus of plaintiff's argument in his brief. Dr. Green is not a specialist in this area and in fact never treated plaintiff for these symptoms. Dr. Green did not ever conduct any tests or make any observations or findings with regard to plaintiff's ability to concentrate, pay attention, or deal with stress.

Plaintiff's first visit with Dr. Green occurred 11 days after the motor vehicle accident. On this first visit, Dr. Green described plaintiff as cooperative with normal mood and affect. There were no complaints of or observations of difficulty paying attention, concentrating, or handling stress. Plaintiff's x-rays were normal. On the second visit, three and a half weeks after the motor vehicle accident, Dr. Green described plaintiff as cooperative with normal mood and affect. There were no complaints of or observations of difficulty paying attention, concentrating, or handling stress. Plaintiff's CT scan and x-rays were normal. His pain level

Case 6:14-cv-03504-REL   Document 13   Filed 01/04/16   Page 24 of 33

had gone down from 7 out of 10 on the previous visit to 5 out of 10 on this visit. Plaintiff was released to return to work the following week. He was told to return for a follow-up visit if his symptoms worsened or recovery was not "as expected." The final visit occurred about two months later, the day before plaintiff applied for disability benefits. Dr. Green observed that plaintiff was able to ambulate normally. On exam he had moderate tenderness and pain in his thoracic spine. He was cooperative with an appropriate mood and affect. X-rays of plaintiff's thoracic spine were taken. He was assessed with back pain and thoracic spondylosis (degeneration of the soft tissue in the thoracic section). Although on the previous visit Dr. Green had released plaintiff to return to work as of April 16 with no restrictions, on this visit he wrote, "Released from work until further notice. I believe he would be a good candidate for disability due to his back problems."

The day before this visit, plaintiff had seen Dr. Briggs at the suggestion of Dr. Green. Plaintiff told Dr. Briggs he had been walking for exercise five to six times per week. Dr. Briggs noted limited range of motion due to muscle tenderness posteriorly, but did not say where the range of motion was limited or by how much. He specifically found on exam that plaintiff's range of motion in his neck and back were normal. He found that plaintiff had normal range of motion in his arms with normal muscle tone and strength, and normal stability. He had normal range of motion, muscle strength, tone and stability in his legs with negative straight leg raising. Plaintiff's mental status exam was normal with no anxiety or agitation. Dr. Briggs reviewed plaintiff's CT scan and found that plaintiff's cervical spine films "show no abnormalities, or instability." The C6 vertebral body hemangioma was "incidental, not pathological" and there were "no acute traumatic changes seen." Dr. Briggs -- the spine specialist to whom Dr. Green had referred plaintiff -- stated that no surgical treatment was indicated; no follow up was needed or recommended; and that plaintiff should lose weight and

participate in range of motion exercises and physical therapy. "You are encouraged to develop a healthy lifestyle including a low fat, low cholesterol diet and regular exercise."

Clearly Dr. Green's opinion on plaintiff's ability to concentrate, pay attention, and work under low stress is not supported by medical signs or laboratory findings. The opinion is not consistent with Dr. Green's own records or the record as a whole. In each of his own medical records, he noted that plaintiff had no psychiatric complaints, and his own psychiatric observations were normal.

Neither is the remainder of Dr. Green's opinion credible. This six-page form was presented to Dr. Green six and a half months after his two-month treatment relationship had ended. Dr. Green left much of the form blank, including the clinical findings and objective signs on which he relied, treatment response, and side effects of medication. He found that plaintiff needed to walk around for 5 minutes every 30 minutes during the day, but he also found that plaintiff could not walk at all without severe pain. Not only is this internally inconsistent, it is inconsistent with plaintiff's own testimony that he can walk for 10 minutes at a time, and it is inconsistent with Dr. Briggs's recommendation that plaintiff engage in regular exercise.

The remainder of plaintiff's treatment records do not support Dr. Green's findings in this medical assessment questionnaire. X-rays reviewed at the Gainesville Medical Clinic showed good alignment in plaintiff's lumbar and thoracic spine. On October 5, 2012, plaintiff told Dr. Atiles that his pain was "mild in severity." Each time he saw Dr. Atiles, plaintiff denied anxiety and depression. When he saw Celeste Williams, a nurse practitioner, he denied anxiety and depression. On June 5, 2013, he indicated he was getting good benefit from his pain medications, he rated his pain a 3 out of 10 in severity, and his medications were continued, indicating his doctor believed that plaintiff's treatment was adequate. On October

26

7, 2013, plaintiff's treatment provider at Behavioral Healthcare noted that he had good memory. On October 23, 2013, plaintiff reported good memory. On January 29, 2014, plaintiff denied memory problems and said his psychiatric symptoms were controlled with his medication. On April 29, 2014, plaintiff's anxiety and depression were noted to be stable. On July 29, 2014, plaintiff reported that he had been the primary caregiver to his elderly parents for the past five years, despite having alleged in his disability case that he is unable to sit, stand, walk or lift. He stated that he "can't think straight" due to anxiety; however, he had been denying anxiety for the past two years to other treatment providers.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision to give little weight to the opinion of Dr. Green in the medical assessment questionnaire.

## VII. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony regarding the severity of his pain was not credible.

## A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by

27

substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of pain are as follows:

> The objective tests contained within the record are not supportive of his allegation of debilitating pain because they show that he has only moderate degeneration in his cervical and thoracic spine.  An MRI of his thoracic spine from January 2013 showed a benign hemangioma[12] at the T4 level and a small focal disc herniation at the T4-T5 and T5-T6 level causing mild effacement[13] of ventral CSF with no significant impingement

---

[12]Although plaintiff states in his brief (p. 5) and reply (p. 1) that symptoms of hemangiomas include pain and swelling, there is no evidence anywhere in plaintiff's medical records that his "benign" hemangiomas caused any symptoms whatsoever.

[13]Plaintiff inaccurately states in his brief (p. 1, 14) and reply (p. 1) that the central disc herniations at T4-5 and T5-6 cause "near complete effacement of the CESF [sic]".  The records clearly state that plaintiff had only mild effacement (Tr. at 402, 435) and there is no evidence

28

or stenosis. An MRI of his cervical spine from March 2013 showed a hemangioma at the C6 level and disc bulges [at] the C5-C6 and C6-C7 levels causing flattening of the thecal sac without any cord compression or stenosis.

The level of treatment he has undergone is also not supportive of his allegation of debilitating pain. In March 2012 through May 2012. . . he was just prescribed medications such as Norco. . . . He was examined at the Springfield Neurological and Spine institute in May 2012. At that time, it was noted that a CT scan of his cervical spine was normal and he did not need any surgery. He consistently received medication management from his primary care provider through February 2013. However, he was only prescribed medications. In February 2013, he began seeking treatment at Pain Treatment Associates. During his treatment there, he has been prescribed various pain medications including hydrocodone and Meloxicam. However, he has only received medication management from the treatment providers there. He has never undergone any type of pain relieving injection in his spine. He has never undergone any type of surgery. He alleges that surgery has been recommended, but this is not stated in any of his treatment notes. He has never undergone any type of physical therapy.

The results of the physical examinations contained within the record are not supportive of his allegation that he has significant pain and difficulty using his arms and legs. In early May 2012, it was noted that he had some moderate thoracic spine tenderness. In late May 2012, it was noted that he had normal strength in his bilateral upper and lower extremities. He had a [negative] Spurling's examination. He had negative straight leg raises. He had normal gait and station. He had normal reflexes and sensation. In February 2013, he exhibited some tenderness in his upper thoracic and lower cervical spine. He exhibited some limited range of motion in his cervical spine. His gait was coordinated and smooth. He had full motor strength in his bilateral upper extremities. He had intact sensation in his bilateral upper extremities. Furthermore, these findings are not supportive of his allegation of significant numbness in his arms. No neurological deficits have ever been noted in his treatment records. If he had a loss of sensation, it seems it would have been documented by his treatment providers.

* * * * *

The claimant testified that he engaged in minimal activities on a daily basis. He reported that he lives with his sister and she helped him with household chores. Although the claimant has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, alleged limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition as opposed to other reasons, in view of the relatively weak medical evidence and other factors. . . .

---

of any symptoms from this condition.

A review of the claimant's earnings record shows he has a fairly good work history. This factor has been taken into consideration in evaluating the claimant's complaints. However, the other inconsistencies in the record outweigh this positive credibility finding.

(Tr. at 31-32).

The ALJ's credibility finding is supported by plaintiff's medical records. In addition to the discussion in the ALJ's opinion, I note that plaintiff's statement to Lu Yang, a social worker at Ozarks Medical Center, during a clinical assessment on July 29, 2014 (almost 2 1/2 years after his alleged onset date) that he has been the primary caregiver to his elderly parents, including one with stage four cancer, contradicts his testimony that he suffers from significant physical limitations.

Plaintiff's medical records do not support his allegation of disabling pain. On October 5, 2012, he described his pain as intermittent and mild in severity. On November 30, 2012, he described his pain as intermittent and mild in severity. On December 28, 2012, he described his pain as intermittent and mild in severity. On June 5, 2013, plaintiff reported good benefit from Norco, Zanaflex, and Meloxicam and reported his pain an average of 3 out of 10. Plaintiff never reported any adverse side effects from his medication.

Although plaintiff testified that he can only sit, stand or walk for 10 minutes each, the medical records do not support that testimony. The medical records are almost devoid of any claim of difficulty sitting, standing or walking. There are no recommendations from any treatment provider that plaintiff limit those activities (in fact, it was recommended that plaintiff exercise regularly). On August 13, 2012, plaintiff was seen at Gainesville Medical Center where he alleged difficulty standing "for long periods." There are no other allegations in the medical records of a difficulty standing. This does not support plaintiff's testimony that he cannot stand for more than 10 minutes.

On May 30, 2012 (two and a half months after the motor vehicle accident) plaintiff told Dr. Briggs that he walks five to six times a week for exercise. On October 5, 2012, he told Dr. Atiles that his pain impacts his walking, but the record does not indicate how or to what extent. On April 23, 2013, plaintiff again told Dr. Atiles that his pain impacts his walking. There are no other allegations of difficulty walking. The ALJ's residual functional capacity assessment limits plaintiff to only two hours of walking and standing per day.

On February 14, 2013, plaintiff told Dr. Kennedy that he has difficulty sitting for "prolonged periods." There are no other complaints of difficulty sitting; there are no observations by any treatment provider of plaintiff having any difficulty with sitting. This contradicts plaintiff's testimony that he can only sit for 10 minutes.

Finally, I note that plaintiff's medical records establish that at the time of his motor vehicle accident he told police and medical personnel at Ozarks Medical Center that he was an intoxicated passenger in the vehicle and that the driver was an individual named Jason who was never observed at the scene (Tr. at 328, 343). The records reflect doubts that Jason "exists" (Tr. at 343). About six months later during a visit with Dr. Atiles, plaintiff said that he had been involved in an accident during which he was the driver and lost control of the vehicle. This does not reflect favorably on plaintiff's credibility.

Based on all of the above I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's allegations of disabling pain are not entirely credible.

## VII.  INABILITY TO AFFORD MEDICAL CARE

Finally plaintiff argues that the ALJ erred in failing to consider plaintiff's "lack of funds when discrediting him regarding further treatment."

> The Plaintiff's allegations of a lack of funds to obtain and/or follow a regimen of medical treatment is well documented. Within his decision the Administrative Law Judge finds that Plaintiff "failed to follow up on treatment", yet he conducted no analysis of the alleged lack of financial means. In addition to finding the rarity of

31

> Plaintiff seeking treatment significant, the Administrative Law Judge also found . . . that Plaintiff received routine or conservative treatment [for] his symptoms [and] his symptoms were not as serious as alleged and [with this] attacked Plaintiff's credibility.

(plaintiff's brief, p. 16).

Contrary to plaintiff's argument, the ALJ never stated that plaintiff failed to follow up on treatment. The ALJ did not state that plaintiff was noncompliant with treatment or that he failed to seek and obtain treatment;[14] rather, he noted that when plaintiff did seek treatment, his providers only recommended medication management. The ALJ also noted that plaintiff had never undergone any pain relieving injections, surgery, or physical therapy. The medical records establish that no pain relieving injections were ever recommended, surgery was not considered an option for plaintiff's condition, and although physical therapy was recommended plaintiff did not apparently follow that recommendation.

Although economic justifications for the lack of treatment can be relevant to a disability determination, plaintiff offered no evidence that he had been denied further treatment (including physical therapy) due to financial or transportation-related constraints. Clark v. Shalala, 28 F.3d 828, 831 n.4 (8th Cir. 1994); Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005) ("However, there is no evidence [that the claimant] was ever denied medical treatment due to financial reasons."). The ALJ explicitly noted that although plaintiff testified that he had been told he needed surgery, this was not reflected in the treatment notes. Plaintiff testified that he needed thousands of dollars before surgery could be performed; however, plaintiff's medical records establish that no doctor would have performed any surgery on plaintiff regardless of his ability to pay. There are no records before me suggesting that recommended

---

[14]In evaluating the opinion of Dr. Green, the ALJ found that the limitations reflected in Dr. Green's opinion were "inconsistent with the fact that the claimant has only undergone a moderate amount of treatment for his impairments. If he was as limited as Dr. Green is opining it seems he would have sought a greater level of treatment." This was not in connection with the ALJ's evaluation of plaintiff's credibility.

treatment or medication could not be obtained due to an inability to pay. Although plaintiff's May 30, 2012, record with Dr. Briggs notes that plaintiff was "self pay," by January 2, 2013, the records show that he was covered by Medicaid. Plaintiff's argument is wholly without merit.

### VIII.  CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 4, 2016